UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RONALD KINDRED AND KIM KINDRED | CIVIL ACTION |
| VERSUS | NO: 10-2788 |
| BLAKE INTERNATIONAL HOLDINGS, L.L.C., ET AL. | SECTION: "S" (3) |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that defendant W&T Offshore, Inc.'s Motion for Summary

Judgment (Doc. # 16) is **GRANTED**, and plaintiff's tort claims against W&T are **DISMISSED**

**WITH PREJUDICE.**

## BACKGROUND

This suit arises out of an accident that occurred on W&T's South Timbalier 316-A ("ST 316-A") oil and gas production platform off the coast of Louisiana in the Gulf of Mexico. On August 3, 2009, plaintiff Ronald Kindred, a roustabout on the ST 316-A, was injured when he stepped onto an unsecured piece of grating on the production deck and fell.

Kindred was a payroll employee of Dynamic Production Services, Inc, assigned as a roustabout on W&T's ST 316-A platform. Dynamic and W&T had a "Master Service Contract"

1

under which Dynamic hired personnel that it supplied to W&T. The contract states that Dynamic is "an independent contractor," and that Dynamic's employees and subcontractors are not "servants, agents or employees of W&T."

Kindred was part of a three-man production team lead by W&T's lead production operator on the ST 316-A, Russell Swanzy. Swanzy was Kindred's direct supervisor. Kindred admitted that he worked fourteen days on, fourteen days off shifts as scheduled by W&T, and he worked the hours that W&T assigned. Kindred testified at his deposition that W&T provided all food and lodging during his fourteen day hitches, as well as transportation to and from the platform. W&T also provided all tools and equipment Kindred needed to perform his work on the platform.

Kindred testified at his deposition, and Swanzy affirmed in his declaration, that Swanzy directed and supervised Kindred's daily work responsibilities. Kindred also testified that if he had questions concerning the work he was performing, he would ask Swanzy or other W&T personnel and follow their instructions. Further, Kindred testified that he never contacted Dynamic for work instructions during his fourteen-day hitches on the ST 316-A. Swanzy's declared that Kindred did not need to consult with Dynamic concerning the work orders or assignments he gave to Kindred, and that Kindred was the only Dynamic payroll employee present on the ST 316-A. Kindred worked as a roustabout for W&T on the ST 316-A for nearly two years.

Under the Dynamic and W&T contract, Dynamic billed W&T for the hours Kindred worked, and Dynamic issued Kindred his paycheck. Kindred testified and Swanzy declared that Swanzy prepared Kindred's time tickets and submitted them to W&T's area foreman, Mike Lofton, for verification and approval before they were forwarded to Dynamic. Likewise, they agree that Lofton had the right to discharge Kindred from his job as a roustabout.

2

W&T filed a motion for summary judgment arguing that it is entitled a judgment that Kindred is W&T's borrowed servant, and therefore Kindred's exclusive remedy against W&T is workers' compensation benefits under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901, et seq.. Kindred argues that summary judgment is inappropriate because there are disputed issues of material fact concerning his borrowed employee status. Kindred asserts that he remained an employee of Dynamic at all times.

## ANALYSIS

### A.   Summary Judgment Standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); FED. R. CIV. PROC. 56(c).  If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986). The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*).  If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

3

**B.     Borrowed Employee Doctrine**

The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1333, et seq., applies to this dispute because Kindred was injured on an oil and gas platform located on the Outer Continental Shelf, off the Louisiana coast.  OCSLA provides that the LHWCA regulates an injured platform worker's right to compensation against his employer. See 43 U.S.C. § 1333(b).  Under the LHWCA, workers' compensation is the exclusive remedy for an employee against his "employer." See id. at §§ 904(a), 905(a).  The United States Court of Appeals for the Fifth Circuit has extended this tort immunity provision to include borrowing employers under the "borrowed employee" doctrine. See Total Marine Servs., Inc. v. Director, Office of Worker's Compensation Programs, 87 F.3d 774, 777 (5th Cir. 1996) (citing Hebron v. Union Oil Co., 634 F.2d 245 (5th Cir. 1981)); Gaudet v. Exxon Corp., 562 F.2d 351 (5th Cir. 1977)); Melancon v. Amoco Prod. Co., 834 F.2d 1238, 1243-44 (5th Cir. 1988).  Accordingly, if this court determines that Kindred was W&T's borrowed employee, W&T will be vested with § 905(a) tort immunity, and Kindred's sole remedy against W&T will be workers' compensation under the LHWCA.

The district court determines the issue of borrowed employee status as a matter of law. See Capps v. N.L. Baroid-NL Indus., Inc ., 784 F.2d 615, 617 (5th Cir. 1986) (citing Gaudet, 562 F.2d at 357-58); Melancon, 834 F.2d at 1244.  "[I]f sufficient basic factual ingredients are undisputed, the court may grant summary judgment." Capps, 784 F.2d at 616 (citing Gaudet, 562 F.2d at 358-59). In Ruiz v. Shell Oil Co., 413 F.2d 310, 312-13 (5th Cir.1969), the United States Court of Appeals for the Fifth Circuit outlined nine factors to be used to determine whether the borrowed employee doctrine applies. These factors include the following considerations:

4

(1)   Who has control over the employee and the work he is performing, beyond mere suggestion of details of cooperation?

(2)   Whose work is being performed?

(3)   Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4)   Did the employee acquiesce in the new work situation?

(5)   Did the original employer terminate his relationship with the employee?

(6)   Who furnished the tools and the place of performance?

(7)   Was the new employment over a considerable length of time?

(8)   Who had the right to discharge the employee?

(9)   Who had the obligation to pay the employee?

See id.; see also Melancon, 834 F.2d at 1244. Although no single factor, or combination of factors, is determinative, the United States Court of Appeals for the Fifth Circuit has generally considered the factor of control to be central. See Brown v. Union Oil Co., 984 F.2d 674, 676 (5th Cir. 1993); Melancon, 834 F.2d at 1245; Capps, 784 F.2d at 617.[1]

**1.     Who had Control Over the Employee and the Work He was Performing?**

Determination of the control factor requires the court to distinguish "'between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work

---

[1] In Gaudet, 562 F.2d at 356, the court de-emphasized the control factor in LHWCA cases and found that the fourth, fifth, sixth, and seventh factors should be considered "essential." ("The principal focus within the Ruiz test in this case should therefore be: (1) was the second employer itself responsible for the working conditions experienced by the employee, and the risks inherent therein and, (2) was the employment with the new employer of such duration that the employee could be reasonably presumed to have evaluated the risks of the work situation and acquiesced thereto?").

5

furnished is part of a larger undertaking.'" Ruiz, 413 F.2d at 313 (quoting Standard Oil Co. v. Anderson, 29 S.Ct. 252, 254 (1909)).

Here, W&T clearly had authoritative direction and control over Kindred and his work. The day after he was hired by Dynamic, Kindred reported directly to W&T for transportation to the ST 316-A. Indeed, he was hired specifically to work for W&T on the ST 316-A. Kindred received his daily work assignments from Swanzy of W&T. Swanzy was Kindred's direct supervisor. Kindred's fourteen days on, fourteen days off work schedule, as well as his hours while he was on the platform, was set by W&T. Dynamic did not have any representatives on the platform to supervise or direct Kindred's work. Besides telling Kindred to report to W&T on the day he was hired, Dynamic had little contact with Kindred during the nearly two years he worked on the ST 316-A. Moreover, Kindred testified that he never contacted Dynamic regarding work during his fourteen-day hitches on the ST 316-A.

Kindred attended sporadic safety training classes with Dynamic, and had some post-accident direction from Dynamic. However, those facts do not preclude a finding of borrowed employee status when W&T personnel told him "what work to do, and when and where to do it." Melancon, 834 F.2d at 1245. The supervision and instruction provided by W&T rose above "mere suggestion of details or cooperation." Accordingly, the control factor weighs in favor of finding that Kindred was W&T's borrowed employee.

### 2.    Whose Work was Being Performed?

The work Kindred performed on the ST 316-A, namely maintaining the platform, maintaining W&T's equipment on the platform, and facilitating the production of oil and gas on the platform,

was in furtherance of the production of oil and gas on W&T's behalf.  He was performing W&T's work.  The second factor weighs in favor of borrowed employee status.

### 3. Was there an Agreement or Understanding Between the Original and the Borrowing Employer?

Dynamic, the original employer, entered into a "Master Service Contract" with W&T, the borrowing employer.  Section 3 of that contract provides that no Dynamic employee is to be considered the servant, agent, or employee of W&T.  "The reality at the work site and the parties' actions in carrying out a contract, however, can impliedly modify, alter, or waive express contract provisions." Melancon, 834 F.2d at 1245.  Analyzing similar contract language, the Melancon court held that the provision did not negate borrowed employee status when the nominal employer clearly understood that the plaintiff would take his instructions from the borrowed employer. See Id.  Here, the reality at the work site shows Dynamic understood that Kindred would be taking his instructions from W&T.  W&T did not need to consult with Dynamic regarding Kindred's work assignments, nor did Kindred himself contact Dynamic concerning work during his fourteen-day hitches on ST 316-A.  Therefore, the contract provision does not prohibit a finding of borrowed employee status.

### 4. Did the Employee Acquiesce in the New Work Situation?

"The focus of this factor is whether the employee was aware of his work conditions and chose to continue working in them." Brown, 984 F.2d at 678.  Here, Kindred worked on W&T's ST 316-A platform for almost two years without lodging any complaints about his working conditions. See Brown, 984 F.2d at 678 (one month sufficient time to appreciate new work conditions).  In addition, Kindred knew that he was being hired by Dynamic to work for W&T on the ST 316-A.  Kindred initially contacted Swanzy, the brother of his sister-in-law, about going to work for W&T.

7

Swanzy had Kindred contact Lofton, who in turn instructed Kindred to contact Dynamic. Thus, the fourth factor indicates that Kindred acquiesced in the W&T work arrangement, and favors borrowed employee status.

**5.      Did the Original Employer Terminate his Relationship with the Employee?**

This factor does not require the lending employer to completely sever its relationship with the employee, because such a requirement would effectively eliminate the borrowed employee doctrine. See Melancon, 834 F.2d at 1238; Capps, 784 F.2d at 617-18. Rather, the court examines the lending employer's relationship with the employee while the borrowing occurs. See Capps, 784 F.2d at 618. Dynamic's control over Kindred was almost entirely nominal while Kindred worked for W&T. Dynamic hired Kindred to work for W&T as a roustabout on the St 316-A. Thereafter, Kindred had no contact with Dynamic regarding his work assignments. Kindred admitted that W&T personnel assigned his daily tasks. Aside from two instances of Kindred attending training classes with Dynamic and his receiving his pay check from Dynamic, his relationship with Dynamic was virtually nonexistent during the time he worked for W&T on the ST 316-A. Thus, the fifth factor weighs in favor of borrowed employee status.

**6.      Who Furnished the Tools and the Place of Performance?**

W&T furnished Kindred with the place of employment, meals, lodging, and transportation to and from the ST 316-A. W&T also provided Kindred with the tools, equipment and supplies he needed on the job. Kindred admitted these facts, but asserts that Dynamic provided him with safety training. Because Dynamic's training was insubstantial, this factor also favors borrowed employee status.

7.    **Was the New Employment Over a Considerable Length of Time?**

The United States Court of Appeals for the Fifth Circuit has held that when "the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee," but that "the converse is not true." Capps, 784 F.2d at 618. Here, Kindred had worked for W&T for nearly two years prior to the alleged accident. He exclusively worked for W&T on the ST 316-A while in Dynamic's employ. Thus, the length of employment favors borrowed employee status.

8.    **Who Had the Right to Discharge the Employee?**

W&T had the right to discharge Kindred from its operations on the ST 316-A. Although W&T did not have the right to terminate Kindred's employment with Dynamic, Kindred admitted that a discharge from W&T would have effectively meant a discharge from Dynamic because there was no other work available for him. W&T's right to terminate Kindred's services on the ST 316-A is enough to satisfy this requirement, and support borrowed employee status. See Melancon, 834 F.2d at 1246; Capps, 784 F.2d at 618.

9.    **Who Had the Obligation to Pay the Employee?**

Kindred received his paychecks from Dynamic, but his pay was based on time tickets completed and approved by W&T personnel. In addition, W&T furnished the funds with which Dynamic paid Kindred. The United States Court of Appeals for the Fifth Circuit has held that this type of arrangement favors borrowed employee status. See Melancon, 834 F.2d at 1246; Capps, 784 F.2d at 618. The fact that Dynamic kept a percentage of the amount W&T paid it for Kindred's services is irrelevant to the determination of borrowed employee status. Melancon, 834 F.2d at 1246.

9

**CONCLUSION**

For the foregoing reasons, applying the <u>Ruiz</u> test to the undisputed facts of this case, as a matter of law Kindred was W&T's borrowed employee. Thus, workers' compensation under the LHWCA is Kindred's sole remedy against W&T.

**IT IS HEREBY ORDERED** that defendant W&T Offshore, Inc.'s Motion for Summary Judgment (Doc. # 16) is **GRANTED,** and plaintiff's tort claims against W&T are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this *15* day of April, 2011.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

10